**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES ex rel. WILLIAM WARD (#B46539), | ) ) ) | |
| Petitioner, | ) ) | Case No. 11 C 3489 |
| v. | ) ) | |
| JOSEPH YURKOVICH,[1] Acting Warden, Hill Correctional Center, | ) ) ) | |
| Respondent. | ) ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Petitioner William Ward's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). For the following reasons, the Court denies Ward's habeas petition and declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

## BACKGROUND

Ward does not present clear and convincing evidence challenging the statement of facts in the last state court decision to address his arguments on the merits, which is the Illinois Appellate Court's opinion on direct appeal, and thus the Court presumes those facts are correct for purposes of its habeas review. *See* 28 U.S.C. § 2254(e)(1); *McCarthy v. Pollard,* 656 F.3d 478, 483 (7th Cir. 2011). The Court therefore adopts the underlying facts as set forth by the Illinois Appellate Court in *People v. Ward*, 371 Ill.App.3d 382, 308 Ill.Dec. 899, 862 N.E.2d

---

[1] Joseph Yurkovich is the Acting Warden of Hill Correctional Center where Ward is currently incarcerated. The Court, therefore, substitutes Yurkovich as the proper Respondent in this habeas case. *See* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts; Fed. R. Civ. P. 25(d).

1102 (1st Dist. 2007).

I.  **Factual Background**

On December 29, 2000, a grand jury indicted Ward for six counts of attempted first degree murder, two counts of aggravated battery with a firearm, six counts of aggravated battery, two counts of aggravated discharge of a firearm, three counts of aggravated unlawful use of a weapon, and two counts of unlawful use of a weapon by a felon. These charges stemmed from a drive-by shooting of two people in Harvey, Illinois on September 24, 2000.

At Ward's criminal trial, Harvey police officer Montague Hall testified that on September 24, 2000, around 7:25 p.m., he responded to a call of shots fired in an alley near 150th and Honore. Officer Hall recovered two .9-millimeter bullet casings at that location. He then spoke with a man on the ground who had been shot in his leg. In addition, Officer Hall testified that he spoke with two other individuals, James Tolbert and Terrence Coprich, who provided him with descriptions of the potential offenders.

Harvey Police Detective Samuel White also testified at Ward's criminal trial and explained that he investigated the September 24, 2000 shooting at the alley around 150th and Honore. In the course of his investigation, Detective White interviewed Tyrone Moten on October 29, 2000. After speaking with Moten, White began to look for Ward. Detective White further testified that on November 17, 2000, he went to Ward's residence and knocked on the door, but no one answered. As he was leaving, he saw Ward drive toward the residence. Detective White and Ward made eye contact and then Ward drove off. Thereafter, Detective White chased Ward in his car to 164th Street and Halsted in Harvey, where Ward exited his car. When Detective White tried to take Ward into custody, Ward punched Detective White.

Detective White, nevertheless, was able to get Ward to the ground after which he handcuffed Ward. Detective White further testified that other Harvey police officers took Ward to the police station while he returned to Ward's residence.

In addition, Detective White testified that upon his return to Ward's residence, he and Illinois Department of Corrections ("IDOC") parole agent, Agent Spiro Giorgakis, entered the residence together. Detective White observed Agent Giorgakis search the bedroom from which Agent Giorgakis recovered a safe and ammunition. Detective White and Agent Giorgakis then returned to the Harvey police station, where they opened the safe and discovered a loaded gun and ammunition. When Detective White questioned Ward the following day, Ward stated that he had stolen the gun from his girlfriend, Marshawn Shelby, who lived with him at the residence. Detective White then sent the gun and ammunition to the Illinois State Police crime lab.

Meanwhile, on November 19, 2000, Detective White met with one of the shooting victims, Michael Walker, at Christ Hospital. At that time, Detective White was accompanied by a felony review Cook County Assistant State's Attorney. Detective White presented Walker with a photo array of six men, including Ward and five others. Walker, however, was unable to identify Ward as the person who shot him.

IDOC Agent Giorgakis also testified at Ward's criminal trial. Specifically, Agent Giorgakis testified – consistent with his suppression hearing testimony – that he was at Ward's residence with Detective White on November 17, 2000. Agent Giorgakis corroborated Detective White's account of Ward pulling up to his residence, seeing the officers, and then driving away. Furthermore, Agent Giorgakis confirmed that Ward punched Detective White after stopping and exiting his car at 163rd Street and Halsted in Harvey. Agent Giorgakis described how he

returned to search Ward's residence explaining that he searched the bedroom and recovered ammunition and a lockbox from under a bed. Agent Giorgakis then testified that he took the lockbox to the Harvey police station, opened it, and recovered a .9-millimeter handgun and four fully loaded clips. He further testified that he turned these items over to Detective White.

At trial, Terrence Coprich testified about the shooting itself. In particular, Coprich stated that on September 24, 2000, he was in the backyard of James and Michael Tolbert's house at 150th and Honore and that Michael Tolbert was working on Walker's car. After Moten came by, Coprich, Moten, and other individuals got into a car and drove to 158th and Vine to look into a fight involving Moten that had occurred earlier. Coprich then testified that he observed Moten, a woman named Sakina, and Ward get into a fistfight. Ward then ran to the back of the house at 158th and Vine. While the others got back into the car, Moten remained outside, picked up a brick, and smashed the windows of Ward's truck. At that time, Coprich grabbed Moten, yelled at him, and pulled him into the car. They then returned to the Tolbert's residence at 150th and Honore.

After returning to 150th and Honore, Coprich testified that he and three others individuals decided to get some beer. As they went back to Coprich's car, they noticed a gray station wagon drive by. Coprich testified that he recognized Ward as the front passenger in the station wagon. Coprich and the others then got in his car and followed the station wagon. Furthermore, Coprich testified that he thought the people in the station wagon would know where his friends were, so he turned into the alley adjacent to the Tolbert residence to try to warn his friends. As Coprich approached the alley, the station wagon entered the alley from another direction. Coprich testified that he saw Ward and another man in the station wagon. Coprich

4

described Ward as having "his head straight." Coprich then saw "a gun come up," "fire," and heard "popping." According to Coprich, Ward shot across the driver's seat of the station wagon after which Coprich fled the scene. Coprich, however, testified that he returned to check on his friends at which time he found that Walker was on his way to a hospital and that J.C. Johnson was lying on the ground after being shot in the leg and hip. On November 19, 2000, Coprich viewed a lineup at the Harvey police station. At that time, Coprich picked out Ward as the person who fired the gun.

On cross-examination, Coprich testified that he did not remember if he talked to the first Harvey police officers who had arrived at the scene of the shooting. Also, Coprich acknowledged that on the same day he had observed the lineup, he gave a statement to Detective White and Cook County Assistant State's Attorney Alzetta Bozeman. Coprich testified that he told Bozeman about the fight between Moten, Sakina, and Ward that preceded the shooting and that Moten had broken the windows of Ward's truck. Coprich explained that he declined to write out his own statement, leaving it to Bozeman to write down what he said. Coprich further recalled that he checked over Bozeman's recording of his statement, made no corrections, and signed it. On redirect, the State did not dispute that Coprich's written statement failed to mention the fight involving Moten and that Moten broke Ward's windows.

J.C. Johnson also testified for the State explaining that on September 24, 2000, he was with Walker, Moten, Sakina, and Lamont Crims at the Tolbert's home. As he and Walker walked down the alley behind the Tolbert's home, a cream-colored station wagon drove toward them. Johnson further testified that gunfire came from the station wagon and that he and Walker began to run. Johnson was struck by a bullet and fell to the ground. He testified that he did not

5

see what happened to Walker. An ambulance then took Johnson to the hospital where he was treated for a dislocated shoulder and a gunshot wound to the buttock that shattered his right femur.

The State also called Michael Walker as a witness at Ward's criminal trial. Walker testified that on September 24, 2000, he took his car to the Tolbert's home to have Michael Tolbert work on it. Walker stated that Tolbert, Johnson, Coprich, and Moten were all at the Tolbert's home that day. Also, Walker testified that at one point, they all got into cars – Walker thought they were going to get beer. He testified that, instead, they ended up at 158th and Vine, where he saw Moten, Moten's cousin, and Ward get into a fistfight. In addition, Walker testified that he saw Moten break the windows of a sport utility vehicle. On the way back to the Tolbert's home, Walker stopped at a music store and bought some compact discs. Walker further testified that after that, he was in the alley behind the Tolbert's home talking with Michael Tolbert when he saw Coprich's car stop nearby. As he approached Coprich's car, Walker observed a station wagon driving toward him. Walker testified that he saw someone raise a gun and that he turned and ran. While running away, he was shot in the back. Thereafter, Walker found himself lying in a puddle gasping for air. The Tolbert brothers then took Walker to the hospital. Walker testified that his next memory was of waking up in the hospital and being told that he was a paraplegic. Walker then testified that he was re-hospitalized on November 19, 2000. During this hospitalization, Assistant State's Attorney Bozeman and Detective White visited him and showed him a photo array. Walker testified that he could not identify the person who shot him because he turned and ran when he saw the gun.

Forensic scientist Jeffrey Parise also testified for the State. After being qualified as an

expert in firearm identification, Parise stated that he received a .9-millimeter semiautomatic pistol and two fired .9-millimeter Luger cartridge cases for analysis. He explained that after ensuring that the gun was safe to test fire, he loaded two .9-millimeter Luger brand cartridges into the gun, fired those rounds into a collection device, and then collected the spent shell casings. Parise further testified that after he examined the casings from the shots he fired, he determined that they matched each other. He then compared the casings from the shots he fired with the casings the Harvey police department gave him, using a side-by-side comparison microscope. From that comparison, Parise formed the opinion – to a reasonable degree of scientific and technical certainty – that the casings the Harvey police had given him had been fired from the gun he had received from the police, to the exclusion of all others.

The defense did not call any witnesses. Instead, defense counsel introduced into evidence Ward's birth certificate and the registered address for Ward with the Secretary of State, which was different from the address where Detective White and Agent Giorgakis found the ammunition and lockbox containing the gun.

The jury acquitted Ward of attempted first degree murder, convicted him of two counts of aggravated battery with a firearm – one for J.C. Johnson and one for Michael Walker – and entered a factual finding, beyond a reasonable doubt, that Ward had caused severe bodily injury to both Johnson and Walker. The trial court sentenced Ward to twenty-years imprisonment for the first battery count and a consecutive fifteen-year sentence for the second battery count.

## II.  Procedural Background

Ward appealed his conviction to the Illinois Appellate Court, First District, arguing that: (1) the jury was subjected to improper influences; (2) the search that uncovered the gun was

unconstitutional; (3) the State's evidence was insufficient to prove his guilt beyond a reasonable doubt; (4) the prosecutor made improper comments during closing argument; (5) the trial court failed to give a jury instruction regarding deadlocked jury deliberations; (6) a jury, rather than a judge, determined the existence of an aggravating sentencing factor in violation of state law; and (7) the trial court failed to hold a hearing regarding his ineffective assistance of counsel allegations. Ward also brought ineffective assistance of trial counsel claims on direct appeal, including that his trial counsel was constitutionally ineffective for: (1) failing to introduce a prior statement from Coprich to the police in which he did not mention the fight earlier in the day; (2) failing to object to the prosecutor's improper comments; (3) failing to preserve Ward's improper jury influence claim; (4) failing to request a jury instruction regarding jury deadlock; (5) agreeing to the appointment of an appellate public defender instead of requesting an immediate hearing regarding his ineffective assistance of trial counsel allegations; and (6) continuing to represent Ward after Ward had requested new counsel. The Illinois Appellate Court rejected Ward's arguments and affirmed his conviction in an opinion entered on September 29, 2006. *See People v. Ward*, No. 1-04-1852, 2006 WL 2796459 (1st Dist. Sept. 29, 2006). On February 2, 2007, the Illinois Appellate Court withdrew its initial opinion and issued a revised opinion on the denial of rehearing in which the Appellate Court rejected Ward's arguments and confirmed his conviction. *See People v. Ward*, 371 Ill.App.3d 382, 308 Ill.Dec. 899, 862 N.E.2d 1102 (1st Dist. 2007).

Ward then filed a petition for leave to appeal ("PLA") in the Supreme Court of Illinois arguing that: (1) the trial court failed to hold a hearing regarding his ineffective assistance of counsel allegations; (2) the jury was subjected to improper influences; and (3) the search that

uncovered the gun used in the drive-by shooting was unconstitutional. The Supreme Court of Illinois denied Ward's PLA on May 31, 2007. Ward then petitioned the United States Supreme Court for a writ of certiorari. The United States Supreme Court denied Ward's petition for a writ of certiorari on January 7, 2008.

Meanwhile, on March 30, 2007, Ward filed a pro se post-conviction petition pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et. seq.*, in the Circuit Court of Cook County, along with several amended post-conviction petitions. On November 20, 2009, the Circuit Court of Cook County denied Ward's post-conviction petition. The record does not reflect what claims Ward raised in his post-conviction petition because during the pendency of his post-conviction appeal, the Illinois Appellate Court sent Ward what appears to be the only copy of his post-conviction record so that Ward could proceed with his appeal pro se. Ward, however, failed to return the record after which the Illinois Appellate Court ordered prison staff to conduct a search for this missing record. The staff could not locate the record, and thus the Illinois Appellate Court suspended the briefing of Ward's post-conviction appeal until Ward submitted evidence that he attempted to return the record. When Ward failed to do so, the Illinois Appellate Court issued the following order:

> THIS CAUSE COMING FORTH ON THE COURT'S OWN MOTION [Ward] being given every opportunity to return the record and failing to do so or provide any proof that he mailed the record to the Clerk of the Appellate Court, we hereby dismiss [Ward's] appeal consistent with our order of April 29, 2010, releasing the record to [Ward] under strict conditions.

(Ex. R, 12/15/10 Order, at 1.)

9

**III.    Habeas Petition**

On August 18, 2011, Ward filed his second amended pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d), which is the controlling habeas petition. *See Newell v. Hanks,* 283 F.3d 827, 834 (7th Cir. 2002) (amended habeas petition supercedes original habeas petition). Construing Ward's second amended pro se habeas petition liberally, *see Martin v. Bartow,* 628 F.3d 871, 878 (7th Cir. 2010), he brings the following claims: (1) the search that uncovered the gun and ammunition was unconstitutional; (2) his trial counsel was constitutionally ineffective for declining to call and cross-examine Marshawn Shelby based on Shelby's pre-trial affidavit that Ward did not reside at her residence where the gun was located and that Ward was not allowed in Shelby's home after April 15, 2000; and (3) trial counsel's decision not to call Shelby at his suppression hearing denied Ward his Sixth Amendment right to confront witnesses.

## LEGAL STANDARDS

**I.    Habeas Standard**

"[I]n all habeas corpus proceedings under 28 U.S.C. § 2254, the successful petitioner must demonstrate that he 'is in custody in violation of the Constitution or laws or treaties of the United States.'" *Brown v. Watters,* 599 F.3d 602, 611 (7th Cir. 2010) (quoting 28 U.S.C. § 2254(a)). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief cannot be granted unless the state court's decision was contrary to, or an unreasonable application of federal law clearly established by the Supreme Court. *See Williams v. Taylor,* 529 U.S. 362, 402-03, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Jones v. Basinger,* 635 F.3d 1030, 1040 (7th Cir. 2011). In *Williams*, the Supreme Court explained that a state court's decision is

"contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams,* 529 U.S. at 405.

Under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See Williams,* 529 U.S. at 407. "A state court's decision is 'unreasonable' within the meaning of § 2254(d)(1) only if it is 'so erroneous as to be objectively unreasonable.'" *Bennett v. Gaetz,* 592 F.3d 786, 790 (7th Cir. 2010) (citation omitted); *see also Williams*, 529 U.S. at 410 ("*unreasonable* application of federal law is different from an *incorrect* application of federal law") (emphasis in original); *Wood v. Allen,* ___ U.S. ___, 130 S.Ct. 841, 849, 175 L.Ed.2d 738 (2010) (state court's factual finding not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance."). To be considered objectively unreasonable, a state court's decision must be "well outside the boundaries of permissible differences of opinion." *Sussman v. Jenkins,* 636 F.3d 329, 361 (7th Cir. 2011) (citation omitted). Put differently, to be reasonable, a state court's decision must be "at least minimally consistent with the facts and circumstances" of the case. *See Williams v. Thurmer,* 561 F.3d 740, 746 (7th Cir. 2009) (citation omitted).

## II.     Exhaustion and Procedural Default

"A state petitioner seeking a writ of habeas corpus in federal court must first exhaust the remedies available to him in state court, 28 U.S.C. § 2254(b)(1)(A), 'thereby giving the State the

11

'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'" *Cheeks v. Gaetz,* 571 F.3d 680, 685 (7th Cir. 2009) (citations omitted). In particular, a habeas petitioner must fully and fairly present his federal claims through one full round of state court review before he files his federal habeas petition. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Gray v. Hardy,* 598 F.3d 324, 327 (7th Cir. 2010). "[W]hen a petitioner has exhausted his state court remedies and failed to properly assert his federal claims at each level of review those claims are procedurally defaulted." *Woods v. Schwartz,* 589 F.3d 368, 373 (7th Cir. 2009). Procedural default precludes federal court review of a petitioner's habeas claims. *See Ward v. Jenkins,* 613 F.3d 692, 696 (7th Cir. 2010).

A habeas petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice or by showing that the Court's failure to consider the claim would result in a fundamental miscarriage of justice. *See House v. Bell,* 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006); *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The Supreme Court defines cause sufficient to excuse procedural default as "some objective factor external to the defense" which prevents a petitioner from pursuing his constitutional claim in state court. *See Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Smith v. McKee,* 598 F.3d 374, 382 (7th Cir. 2010). Prejudice means actual prejudice infecting the "entire trial with error of constitutional dimensions." *Murray*, 477 U.S. at 494 (citation omitted). A fundamental miscarriage of justice occurs when a habeas petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496.

## ANALYSIS

I.  **Fourth Amendment Claim**

Ward maintains that the Harvey police and IDOC Agent Giorgakis violated his Fourth Amendment right by searching the residence in which the police found the gun and ammunition. Ward moved to suppress the gun and ammunition prior to trial and brought this argument on direct appeal to the Illinois Appellate Court and in his PLA to the Supreme Court of Illinois. Accordingly, Ward has not procedurally defaulted this claim. *See Johnson v. Hulett,* 574 F.3d 428, 431 (7th Cir. 2009) ("To obtain federal habeas review, a state prisoner must first submit his claims through one full round of state-court review"). Nonetheless, because Ward had an opportunity for full and fair litigation of this issue in the Illinois courts, this habeas claim is foreclosed by *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), which holds that when a "State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at the trial." *See id.* at 482; *see also Ben-Yisrayl v. Buss*, 540 F.3d 542, 552 (7th Cir. 2008). Put differently, "*Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), holds that federal courts hearing collateral attacks under § 2254 may not enforce the exclusionary rule unless the state judiciary denied the defendant a full and fair opportunity to contest the search or seizure." *Hayes v. Battaglia,* 403 F.3d 935, 939 (7th Cir. 2005). As the Seventh Circuit explains, "'full and fair' guarantees the right to present one's case, but it does not guarantee a correct result." *Cabrera v. Hinsley*, 324 F.3d 527, 532 (7th Cir. 2003). Thus, absent a subversion of the hearing process, it is not the federal habeas court's role to determine

whether the state trial court made the right decision. *See Ben-Yisrayl,* 540 F.3d at 552.

Here, Ward does not argue – nor is there evidence in the record – that there was a subversion of the suppression hearing process in relation to this claim. Indeed, the record reflects that the Illinois trial and appellate courts heard and rejected this Fourth Amendment claim on the merits. *See Ward,* 371 Ill.App.3d at 407-414; Ex. C, 4/26/2004 Suppression Hr'g at 302-39. Because Ward had a full and fair opportunity to contest the search at issue, his habeas claim based on the Fourth Amendment is without merit.

## II.    Ineffective Assistance of Counsel Claim

Ward also argues that his trial counsel was constitutionally ineffective for not calling his girlfriend Marshawn Shelby as a trial witness based on Shelby's affidavit that Ward did not reside at her residence where the gun was located and that Shelby did not allow Ward in her home after April 15, 2000. To establish constitutionally ineffective assistance of counsel, Ward must establish that (1) his attorney's performance "fell below an objective standard of reasonableness," and (2) "but for counsel's unprofessional errors the result of the proceeding would have been different" meaning "a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Court's "review of the attorney's performance is 'highly deferential' and reflects 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Koons v. United States,* 639 F.3d 348, 351 (7th Cir. 2011) (citation omitted). Courts "assess counsel's work as a whole, and 'it is the overall deficient performance, rather than a specific failing, that constitutes the ground

14

of relief.'" *See Brown v. Finnan,* 598 F.3d 416, 422 (7th Cir. 2010) (citation omitted). If Ward fails to make a proper showing under one of the *Strickland* prongs, the Court need not consider the other. *See id.* at 697 ("In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant").

Because Ward's post-conviction record is missing, the Court cannot determine whether Ward brought this claim in his post-conviction petition or if he properly exhausted it or procedurally defaulted it under 28 U.S.C. § 2254(b)(1)(A). The Court therefore assumes that "no state court has squarely addressed the merits" of this claim. *See Kerr v. Thurmer,* 639 F.3d 315, 326 (7th Cir. 2011). Under these circumstances, the Court reviews Ward's ineffective assistance of counsel claim under 28 U.S.C. § 2243, which directs that the Court "dispose of the matter as law and justice require." *Id.*; *see also Johnson v. Thurmer,* 624 F.3d 786, 791 (7th Cir. 2010).

At his suppression hearing, Ward stipulated that "if called to testify Marshawn Shelby will testify that the safe found under the bed in the bedroom located at 15745 Lathrop in Harvey, Illinois, on November 17th, 2000 by Harvey Police officers and agents from the Illinois Department of Corrections, belongs to William Ward." (Ex. A, Shelby Stip., at 76.) Based on this stipulation and trial evidence that on November 18, 2000 Ward told Detective White that he lived with Shelby at the residence in question, defense counsel's performance was well within the wide range of reasonable professional assistance because the Constitution does not require counsel to raise every available nonfrivolous defense, let alone frivolous ones. *See Knowles v. Mirzayance,* 556 U.S. 111, 129 S.Ct. 1411, 1422, 173 L.Ed.2d 251 (2009). Moreover, assessing defense counsel's work as a whole, counsel provided constitutionally effective assistance,

15

especially because the jury acquitted Ward of the most serious charges, namely, the attempted first degree murder charges. *See Brown,* 598 F.3d at 422. Ward's ineffective assistance of counsel claim thus fails.

### III. Right to Confront Witness Claim

Ward's final habeas claim is that he was denied his right to confront witnesses, namely, Marshawn Shelby, at his suppression hearing. Due to the missing post-conviction record, the Court will determine this habeas case under 28 U.S.C. § 2243, which directs that the Court "dispose of the matter as law and justice require." As discussed, defense counsel offered a stipulation into evidence that Shelby would have testified that the gun recovered from her home belonged to Ward.

As the Seventh Circuit explains, a "defendant's attorney can waive his client's Sixth Amendment confrontation right so long as the defendant does not dissent from his attorney's decision, and so long as it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy." *Yu Tian Li v. United States,* 648 F.3d 524, 531 (7th Cir. 2011) (citation omitted). Here, counsel opted to challenge the search that uncovered the gun as unlawful under the Fourth Amendment instead of challenging the ownership of the gun, especially because – at that point – it was undisputed that Ward lived at Shelby's residence during the relevant time period. Further, nothing in the record indicates that Ward objected to the parties' stipulation until he filed the present amended habeas petition. Therefore, Ward's confrontation clause has no factual basis.

**IV.    Certificate of Appealability**

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant Ward a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) in this order.

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, instead, he must first request a certificate of appealability. *See Miller-El v. Cockrell,* 537 U.S. 322, 335, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); *Sandoval v. United States,* 574 F.3d 847, 852 (7th Cir. 2009). A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See Miller-El,* 537 U.S. at 336; *Narvaez v. United States,* 641 F.3d 877, 881 (7th Cir. 2011); 28 U.S.C. § 2253(c)(2). Under this standard, Ward must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El,* 537 U.S. at 336 (quoting *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).

Here, jurists of reasons would not debate the Court's conclusion that Ward had an opportunity for full and fair litigation of his Fourth Amendment claim in the Illinois courts, that his defense counsel provided constitutionally effective assistance of counsel, and that Ward did not have a factual basis for his Sixth Amendment confrontation claim. Therefore, the Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For these reasons, the Court denies Ward's petition for a writ of habeas corpus and declines to certify any issues for appeal. *See* 28 U.S.C. §§ 2253(c)(2), 2254(d).

**Dated:** November 14, 2011

**ENTERED**

**AMY J. ST. EVE**
**United States District Judge**